UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| TRACY BARLOW, *et al.*, )<br>)<br>Plaintiffs, )<br>)<br>v. )<br>)<br>GENERAL MOTORS CORPORATION, )<br>)<br>Defendant. ) | CASE NO. 1:02-cv-1077-DFH-TAB |

ENTRY ON PENDING SUBSTANTIVE MOTIONS

Several motions remain pending in this action.  All but one are resolved by this entry.  First, the court grants defendant General Motors' motion to bar plaintiffs' belated damages disclosures and for sanctions (Dkt. No. 510).  Second, the court denies General Motors' motion for summary judgment on loss of enjoyment damages (Dkt. No. 512), although plaintiffs will not be able to rely on the evidence and theories they first disclosed in the late disclosures.  Third, the court grants General Motors' motion for summary judgment on plaintiffs' claims for emotional distress damages to the extent those claims are based on fear of health effects (Dkt. No. 517), although this ruling will not prevent plaintiffs from testifying about annoyance, harassment, and disturbance of their ability to enjoy their property.  Fourth, the court denies General Motors' motion to exclude the testimony of Dr. David Teitelbaum (Dkt No. 519).  Fifth, the court grants General Motors' motion for summary judgment on the claims of several plaintiffs for

damages based on contamination of three water wells (Dkt. No. 492). Sixth, the court denies as moot and superseded General Motors' earlier motion to dismiss and preclude plaintiffs' claims for damages (Dkt. No. 494). The one matter that remains pending is the court's reconsideration of its earlier denial (Dkt. No. 477) of plaintiffs' motion to compel production of certain documents that General Motors has asserted are protected by attorney-client and work-product privileges.

I.      *Background*

Defendant General Motors Corporation has operated a die casting plant in Bedford, Indiana since 1946. Plaintiffs in this case are owners and residents of land located near the Bedford plant. Plaintiffs allege that over the course of several decades, the General Motors Bedford plant released polychlorinated biphenyls ("PCBs") that have contaminated their land. General Motors has undertaken a clean-up effort of nearby properties pursuant to an agreement with the United States Environmental Protection Agency and the Indiana Department of Environmental Management. Plaintiffs in this case contend that the government-approved clean-up effort is too limited, and they seek damages on a variety of theories, primarily trespass and nuisance.

Environmental contamination in residential areas can support a wide range of damage claims. In this case, plaintiffs have backed away from the most serious types of claims. No plaintiff claims that he or she has become ill as a result of

exposure to PCBs released by General Motors.  A clean-up effort is underway under the supervision of state and federal regulators.  The stage for the present motions was set when the court ruled on a previous batch of motions on September 18, 2006.  *Allgood v. General Motors Corp.*, 2006 WL 2669337 (S.D. Ind. Sept. 18, 2006).[1]  The court granted summary judgment in favor of General Motors on a number of issues and claims.  The court found that plaintiffs were not entitled to medical monitoring damages and that General Motors was entitled to summary judgment on plaintiffs' unjust enrichment claims.  The court also found that plaintiffs were not entitled to damages based on the estimated costs of a much more thorough and expensive (but hypothetical) clean-up effort that would have far exceeded the total fair market value of plaintiffs' properties in the absence of any PCB pollution.  The court dismissed as not yet ripe plaintiffs' claims for alleged long term "stigma" damage to their property values.  The court denied summary judgment for General Motors on claims relating to three water wells.  Not all claims and damage theories were addressed by General Motors' motions or the court's rulings.

The court held a status conference on October 13, 2006.  Because the September 18th ruling had reshaped the case so much by rejecting plaintiffs' theories for the greatest amount of damages, the court decided over General Motors' objection to allow plaintiffs one final opportunity to revise their damage

---

[1]Earlier decisions bear the caption *Allgood v. General Motors*, but the Allgoods settled and dismissed their claims in April 2007.

theories to conform to the court's rulings on the applicable law.  The court also decided to allow General Motors to file a new round of motions for summary judgment if it believed the plaintiffs' responses were inadequate.  Although plaintiffs had not offered any expert testimony as to the lost value of their properties, the court observed that plaintiffs could offer their own opinions on lost value of their properties, as plaintiffs have argued all along.  See *Allgood*, 2006 WL 2669337, at *36 n.14, citing *In re Coyle*, 671 N.E.2d 938, 945 (Ind. App. 1996), and *Jordan v. Talaga*, 532 N.E.2d 1174, 1188 (Ind. App. 1989).  In a written order issued the same day, on October 13, 2006, the court set a new trial date of October 9, 2007 and ordered as follows:

> Over objection of defendant, the court stated that plaintiffs would be allowed to submit a supplemental expert report from Dr. Teitelbaum that complies with Fed. R. Civ. P. 26(a)(2) supporting any plaintiff's claim for damages for emotional distress.  Such report must be served no later than November 30, 2006.  Also no later than November 30, 2006, plaintiffs shall serve on defense counsel a detailed and individualized statement of all remaining claims for damages and the factual bases for those claims.
>
> No later than February 15, 2007, General Motors may file additional motions for summary judgment, take an additional deposition of Dr. Teitelbaum, designate rebuttal expert(s) with reports under Rule 26(a)(2) to respond to Dr. Teitelbaum's supplemental report.

Docket No. 482.  The November 30, 2006 deadline was intended to give plaintiffs brief but adequate time, after their principal damage claims had been rejected, to reconstruct their case for damages while also allowing defendant to conduct additional discovery and then to move for summary judgment if it thought the responses were not sufficient to require a trial.

In their response of November 30, 2006, plaintiffs did not express any of their own opinions about lost value of their properties.  Instead, plaintiffs served on defendant an entirely new expert report from real estate appraiser Nick Tillema asserting estimates for lost rental value of the property in question.  Tillema's report estimated the total lost rental value as $480,216 for all properties still involved in the case.

Plaintiffs' November 30, 2006 responses took the form of supplemental interrogatory responses.  Those responses included numerous objections and reservations, including an asserted right to amend and supplement, that were not consistent with the court's order that the November 30th deadline was a final one for providing "a detailed and individualized statement of all remaining claims for damages and the factual bases for those claims."  General Motors filed a motion to dismiss, preclude, and for other relief against plaintiffs' purported claims for damages (Dkt. No. 494) attacking these responses.  On January 22, 2007, plaintiffs responded by withdrawing those objections and reservations, including the claimed right to supplement.  See Docket No. 500 at 2, and Exhibit B.

In response to the plaintiffs' November 30th supplements, General Motors moved to strike the Tillema report as a deliberate violation of the court's orders.  On February 2, 2007, the court granted General Motors' motion to strike the Tillema report.  *Allgood v. General Motors Corp.*, 2007 WL 647496 (S.D. Ind.

Feb. 2, 2007).  The court also ordered that General Motors recover as sanctions from plaintiffs its attorney fees incurred in moving to strike the Tillema report.

In their November 30, 2006 response, plaintiffs also did not submit any new testimony from Dr. Teitelbaum, the expert witness they had offered to support their emotional distress damages claims.   In their individual responses to interrogatories, plaintiffs offered the following:  "I believe that I have been exposed to substances, including PCBs, released by the GM Bedford Plant.  As such, I have suffered restlessness, worry and apprehension due to my exposure to PCBs, the increased risks to my health, and the contamination of my land."  Dkt. No. 518, Ex. A.  Plaintiffs' interrogatory answers also report that they cannot go outside on windy days without getting dust from the clean-up on them, and vehicles quickly get dirty from dust from the clean-up.  Plaintiffs report that much of the beauty and usefulness of their property has been lost, "causing us much emotional distress."  Trees and natural growth have been removed.  The land is scarred by the pollution and the clean-up.   Two plaintiffs report that they have seen counselors for stress, anxiety, and anger arising from the situation, but they have provided no bills or other details that would have needed to be disclosed by now.

Plaintiffs responded to the court's order striking the Tillema report by serving a new round of statements of damages on February 9 or 12, 2007.[2]

_____

[2]The ambiguity between February 9th and 12th stems from plaintiffs' counsel's attempt to serve the responses by hand on local counsel for General (continued...)

General Motors has moved to strike those February 12th damages claims and for sanctions.  The result of plaintiffs' attempts to rescue their damage claims has been a tangle of intertwined motions, virtually all of which stem from plaintiffs' failure to comply with the court's deadline giving them a final chance to restate the details of their damage claims by November 30, 2006.  The court concluded that the tangle of motions required the postponement of the trial date upon which the deadlines had been built.  It has taken a considerable amount of time for the court to clear enough time in its schedule to untangle the present motions.  The court dealt with some non-dispositive motions on March 31, 2008, and left these more substantive issues for later.

II.     *General Motors' Motion to Bar Plaintiffs' February 12th Damages Claims and for Sanctions (Dkt. No. 510)*

The problem presented by this motion is symptomatic of the many and convoluted problems produced by plaintiffs' attorneys' approach to this case. After the court rejected plaintiffs' principal damages theories in September 2006, the court met with counsel for all parties on October 13, 2006 to set a trial date and to address what more needed to be done to prepare for trial.  At that point,

---

[2](...continued)

Motors on the evening of Friday, February 9, 2007, after their office had closed for the weekend.  One of plaintiffs' lawyers apparently convinced a security guard to allow him to enter the private offices of the Indianapolis law firm representing General Motors.  The court has felt no need to attempt to resolve the accusations concerning this entry into the offices.  Other forums were available to pursue the matter.  This court has enough on its plate in this case.  The court refers to the new disclosures as having been made on February 12, 2007.

the case had been pending for more than four years.  Discovery had been closed. The case should have been ready for trial in short order.  In the court's view, however, the interests of justice required that plaintiffs have a final opportunity to amend and clarify their surviving claims for damages.

The court took that step over General Motors' objection, but the court wanted to ensure that plaintiffs made this their final "do-over" and provided detailed and individualized damages claims.  The court took this step to allow plaintiffs to rescue what might well be a good case on the merits from much of the harm caused by plaintiffs' absurdly ambitious damages theories.  See *Allgood v. General Motors Corp.*, 2006 WL 2669337 (S.D. Ind. Sept. 18, 2006) (rejecting plaintiffs' efforts to base damages on the estimated costs of a fictional clean-up effort that would cost at least 20 times the total fair market value of plaintiffs' properties).  Plaintiffs and their attorneys had chosen to "swing for the fences" by seeking an eight- or nine-figure compensatory damage award based on untenable theories rather than focusing on more supportable but more modest theories.

The court must assume that these plaintiffs have suffered genuine harm as a result of General Motors' releases of PCBs.  Rather than leave them entirely without a remedy, the court chose to give plaintiffs that final opportunity to revise their claims for damages by November 30th.  Specifically, the court ordered plaintiffs to provide no later than November 30, 2006 "a detailed and individualized statement of all remaining claims for damages and the factual bases for those

claims." Docket No. 482. This order was combined with an extension of discovery for General Motors to respond to the November 30th statements and a trial setting for October 13, 2007.

Plaintiffs' November 30th responses included the new expert witness report from real estate appraiser Nick Tillema, which the court struck. See *Allgood v. General Motors Corp.*, 2007 WL 647496 (S.D. Ind. Feb. 2, 2007). Plaintiffs responded to the court's decision striking Tillema's report with yet another unauthorized effort to revise and supplement their damages claims. The February 12th disclosures included entirely new numbers from plaintiffs themselves asserting lost rental values for their properties. Whereas the late and stricken Tillema report had estimated total lost rental values for plaintiffs' properties to total $480,216, plaintiffs themselves belatedly claimed lost rental values totaling more than ten times that sum, $4,899,130. Plaintiffs' February 12th disclosures also put numbers on the emotional damages claims for the first time. All but one of the adult plaintiffs claimed that they had "calculated" their emotional damages as $1.5 million each. The remaining adult plaintiff, Ms. Raines, claimed she calculated a figure of $3.5 million for her emotional distress damages. The February 12th disclosures also provided new damage figures for the well water damages by owners of three properties, without explanation. The February 12th disclosures also suggested for the first time several alternative methods for calculating punitive damages:

a.    An award of all or a percentage of GM's profits from the Bedford Foundry during all or part of the period during which PCBs were released from the Foundry; or

b.    An award from one tenth of one percent to one percent of GM's gross revenue during any year for which this lawsuit has been pending; or

c.    An amount equal to the total cost of GM's cleanup of PCB contamination in Bedford; or

d.    Such other sum as the jury may determine will deter GM from such conduct in the future.

General Motors has responded to the February 12th disclosures with a motion to exclude these damages claims and theories and for sanctions. As explained below, plaintiffs' new damages claims disclosed on February 12th must be excluded because they came so late, in violation of the court's order of October 13, 2006, because there was no excuse for the late disclosure, and because the late disclosures prejudiced both General Motors and the court.

When given a final chance to come forward with specific and detailed statements of their damages on November 30, 2006, nothing prevented plaintiffs from offering their own opinions of the lost rental values of their properties. Instead, plaintiffs and their attorneys made a strategic decision to try to rely on the new and unauthorized Tillema report.

Plaintiffs' only effort to justify the February 12th disclosures is to rely on Rule 26(e) and Rule 26(a)(3) of the Federal Rules of Civil Procedure.  Rule 26(a)(1)(A)(iii) requires that initial disclosures include "a computation of each

-10-

category of damages claimed by the disclosing party," who must also make available for inspection and copying the documents or other evidence upon which each computation is based.  Rule 26(e) imposes a duty on a party to supplement initial disclosures and discovery responses if the party learns the disclosure or response was incomplete or incorrect.  Rule 26(a)(3) governs pretrial disclosures – witness lists, deposition designations, and exhibit lists – and provides:  "Unless the court orders otherwise, these disclosures must be made at least 30 days before trial."   Rule 26(a)(3)(B).   Rule 26(e)(2) further provides that a party must supplement a paid expert's report or deposition answers within the time for the final pretrial disclosures under Rule 26(a)(3).[3]

Plaintiffs' theory is that their February 12th disclosures were merely supplements under Rule 26(e) and Rule 26(a)(3), that they were made more than 30 days before trial, and that nothing in the court's October 13th order modified or affected their "right" to supplement.  This theory is also based on the plaintiffs' contention that the October 13th order requiring "a detailed and individualized statement of all remaining claims for damages and the factual bases for those claims" did not impose on plaintiffs any duty to provide a "computation" of their damages.  Plaintiffs argue:  "The Order did not require a computation of damages

---

[3]Effective December 1, 2007, while these motions were pending, Rule 26 was rewritten as part of the general re-styling of the federal rules.   The amendments were not intended to change meaning, but the changes affected some of the internal numbering of Rule 26.  The court uses the current numbering for ease of reference.

and did not put Plaintiffs on notice of any deadline for supplementation of their damage computations under" Rule 26(a)(1)(A)(iii).  Dkt. No. 525 at 8.

This theory fails on several levels.  First, plaintiffs' theory seeks to turn their duty to supplement their initial damages disclosures into an opportunity and even a right to hold back their real damages theories and computations until nearly the eve of trial.  That is not what Rule 26(e) and 26(a)(3) do.  Rule 26(e) was intended to ensure prompt disclosure of new information, not to allow parties to spring late surprises on their opponents under the guise of a "supplement" to earlier disclosures.  See *Solaia Technology LLC v. ArvinMeritor, Inc.*, 361 F. Supp. 2d 797, 806 (N.D. Ill. 2005), citing *Coles v. Perry*, 217 F.R.D. 1, 3 (D.D.C. 2003) (striking late-filed report styled as a "supplemental opinion"); *Reid v. Lockheed Martin Aeronautics Co.*, 205 F.R.D. 655, 662 (N.D. Ga. 2001) (Rule 26(e) imposes duty on producing party; it does not give that party a right to rely on supplements to produce information required by earlier deadline); *Beller v. United States*, 221 F.R.D. 689, 695 (D.N.M. 2003) (striking "supplemental" report with opinions broader and deeper than and different from those provided in original timely report); see also *Metro Ford Truck Sales, Inc. v. Ford Motor Co.*, 145 F.3d 320, 324 (5th Cir. 1998) (affirming exclusion of late report presented as "supplement": "The purpose of supplementary disclosures is just that – to supplement.  Such disclosures are not intended to provide an extension of the expert designation and report production deadline."); *Gilbane Building Co. v. Downers Grove Community High School*, 2005 WL 838679, *9 (N.D. Ill. April 5, 2005) (rejecting attempt to

"supplement" with an entirely new subject and analysis); *Keener v. United States*, 181 F.R.D. 639, 640-41 (D. Mont. 1998) (excluding defendant's late attempt to present "supplement" with the substantive opinions in the case).  In other words, the *duty* to supplement cannot be transformed into a *right* to ambush just before trial.

Second, plaintiffs' supplement theory is based on a misreading of Rule 26(e). Rule 26(e)(2) adopts the final pretrial disclosure deadline of Rule 26(a)(3) only for supplements to expert witness disclosures and deposition testimony.   That provision of Rule 26(e)(2) does not apply to supplements to initial disclosures and discovery responses apart from expert witnesses.  That difference is not accidental. Under plaintiffs' theory, plaintiffs would be free to hold back their real damages theories until just 30 days before trial (absent a contrary court order).   That loophole would undermine most of what Rule 26 as a whole tries to accomplish by requiring disclosures of evidence and damages claims long before trial to avoid the proverbial trial by ambush.  In any event, nothing in plaintiffs' February 12th disclosures involved supplements to expert witness testimony, so the plaintiffs' reliance on Rule 26(e)'s adoption of the final pretrial disclosure deadlines of Rule 26(a)(3) misses the mark.

Third, plaintiffs' supplement theory is simply not a reasonable reading of the court's order of October 13th.  In defending their tactics, plaintiffs have tried to transform this aspect of the October 13th order into an accommodation of General

Motors.  It was nothing of the sort.  After rejecting plaintiffs' damages claims that "swung for the fences," the court might have simply held plaintiffs to those theories and barred efforts to develop new damage theories and evidence.  Plaintiffs and their attorneys had made strategic choices to pursue exaggerated and unsupported damages claims.  The court could have held them to those theories.  In the interests of justice, however, the court recognized that plaintiffs have suffered, at the very least, considerable inconvenience, annoyance, and disturbance as a result of the General Motors pollution and clean-up effort.  The court therefore exercised its discretion to give the plaintiffs a final opportunity to rescue legitimate and reasonable damages claims.

In return, the plaintiffs were obliged to provide the "detailed and individualized statement of all remaining claims for damages and the factual bases for those claims."  At that point, the case was more than four years old and was ready for final trial preparations.  Giving plaintiffs that final opportunity to rescue their case required that General Motors receive both (a) fair notice of the new theories and evidence and (b) a fair opportunity to conduct additional discovery and to develop evidence to rebut the new theories and evidence.  Hence the obligation to provide the "detailed and individualized statement of all remaining claims for damages and the factual bases for those claims."  Plaintiffs and their attorneys could not reasonably and honestly have believed that this final opportunity to fix their case left a gaping loophole that would have allowed them to hold back the detailed contents of their February 12th disclosures, including

even the dollars they were seeking, for later, perhaps as late as a mere 30 days before trial.  Plaintiffs' proffered reading of the court's October 13th order is simply untenable.

In fact, plaintiffs' supplement theory is inconsistent with plaintiffs' own earlier approaches to the same October 13th order.  Even with the unauthorized new Tillema report submitted on November 30th, plaintiffs provided detailed and specific damages numbers, parcel by parcel, based on Tillema's asserted expertise. When plaintiffs were trying to justify the submission of Tillema's new (and belated) report, they acknowledged that the October 13th order allowed them to supply to General Motors and the court "additional materials and evidence to buttress Plaintiff's remaining claims.  The report submitted by Nick Tillema (the 'Tillema Report') in conjunction with the Plaintiffs' submission on November 30, 2006, simply sets forth the Plaintiffs' damages for a number of their causes of action." Dkt. No. 496 at 1.  In terms inconsistent with their current position, plaintiffs then continued:  "In order to allow Plaintiffs to present a detailed and individualized statement of their remaining claims for damages, including loss of use, a determination of the fair market value of the real estate, as well as the fair market rental value of the real estate, was also necessary.  Mr. Nick Tillema . . . then performed additional appraisal work, on the Plaintiffs' properties in order to set forth the detailed individual statement of the remaining claims associated with real estate values."  *Id.* at 3.  The Tillema report was late and unauthorized for different reasons.  But plaintiffs' defense of it, filed December 27, 2006, shows that they had

clearly understood what was expected to comply with the court's October 13th order.  That defense helps show that plaintiffs' more recent interpretation of the October 13th order is not credible.

Plaintiffs' failure to comply with the November 30th deadline set by the October 13th order caused prejudice to both General Motors and the court, and that prejudice is sufficient to warrant exclusion of the matters disclosed for the first time in the February 12th disclosures.  Throughout this case, plaintiffs have presented moving targets to General Motors with respect to the merits and their damages claims.  General Motors understandably objected to the last opportunity the court provided in the October 13th order.  The court expected that plaintiffs would come forward with detailed claims for the available types of damages and that disclosure would be followed by a final round of discovery by General Motors, with an opportunity to develop rebuttal evidence, including expert testimony. While the court did not expect the process to be frictionless, the court did expect that the path would enable fairly smooth and preparation for a complex trial roughly a year later, giving each side a fair opportunity to prepare its case.  By failing to comply with the court's order, plaintiffs and their attorneys imposed additional cost and delay on General Motors.  Plaintiffs' late disclosures on February 12th prejudiced both General Motors and the court's schedule.  Much of that harm has already occurred because of the tangle of motions that have arisen in response to plaintiffs' failures.  That harm is directly attributable to plaintiffs' failures to comply with the court's order.

The passage of time since these deadlines passed cannot be overlooked.  In theory, it might still be possible now to allow plaintiffs yet one more "do-over," with more time for discovery and trial preparation.  But the court has already given plaintiffs that opportunity, and they abused it, as General Motors' motions and this decision reflect.  The interests of justice do not require yet another opportunity to fix these problems.  Also, the delay is directly correlated to plaintiffs' approach to the case.  These motions have required an unusual amount of the court's time, which could not easily be cleared on the court's schedule without being unfair to other litigants who have met their deadlines and obligations to opposing parties.[4]

In addition, for essentially the same reasons set forth in the decision imposing sanctions for plaintiffs' efforts to offer the new and late Tillema report, 2007 WL 647496, at *7, the court finds that plaintiffs and their attorneys should be sanctioned by paying General Motors for its attorney fees incurred in moving to exclude these late disclosures.  The violation of the court's order was clear, and the excuses and justifications are so thin as to be disingenuous.  General Motors may submit no later than February 20, 2009 a statement of its fees and costs incurred

---

[4]On the merits, plaintiffs' calculations of their lost rental values cannot be taken seriously.  Recall that when the court gave plaintiffs the opportunity to fix the hole in their case by providing detailed statements of their damages, including this element, they chose to rely on the unauthorized and late Tillema report. Tillema, the expert appraiser, calculated lost rental value as $480,216.  When the court struck the Tillema report, plaintiffs then supposedly used their knowledge of their own property (as Indiana allows) to come up with numbers more than ten times that sum, $4.9 million.  This is another example of the moving targets and apparently random numbers generated by plaintiffs.

in preparing and briefing its motion to exclude the February 12th disclosures. Plaintiffs may file a response no later than 14 days later.  If no party requests an evidentiary hearing on the issue of the amount, the court will rule on the papers.

In sum, plaintiffs' February 12th disclosures were too late, unexcused, and prejudicial.  Plaintiffs must and should be precluded from relying on or offering evidence set forth in those late disclosures.  That ruling does not mean by itself, however, that plaintiffs should not be entitled to claim emotional distress or loss of enjoyment damages, or that they should not be entitled to seek damages for well water remediation or punitive damages.  The court takes up below General Motors' motions for summary judgment on the loss of enjoyment damages, emotional distress damages, and well water remediation damages.  On the issue of punitive damages, if plaintiffs can come forward with evidence at trial that would support an award of punitive damages, the fair response to the plaintiffs' failures is to bar them from offering the jury any specific method for calculating any award of punitive damages.  That solution is not entirely satisfactory, of course, but it is the best remedy that can be tailored to fit the plaintiffs' disdain for the court's October 13th order and the opportunity it gave them to try to rescue their case from their earlier errors.

III.    *General Motors' Motion for Summary Judgment on Loss of Enjoyment Damages (Dkt. No. 512)*

As a corollary to its motion to exclude the February 12th disclosures, General Motors has moved for summary judgment in its favor on all plaintiffs' claims for damages for loss of enjoyment of their property. The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Summary judgment is appropriate when there are no genuine issues of material fact, leaving the moving party entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party must show there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A factual issue is material only if resolving the factual issue might change the suit's outcome under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual issue is genuine if there is sufficient evidence for a reasonable jury to return a verdict in favor of the non-moving parties on the evidence presented. *Id.*

In deciding a motion for summary judgment, the court may not make credibility determinations, weigh the evidence, or choose from among different reasonable inferences that might be drawn from the evidence. *Paz v. Wauconda Healthcare and Rehabilitation Centre, LLC*, 464 F.3d 659, 664 (7th Cir. 2006) (reversing summary judgment); *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003) (reversing summary judgment). The court must view the evidence in the light reasonably most favorable to the non-moving parties, giving them the benefit of

conflicts in the evidence and the most favorable reasonable inferences.  *Paz*, 464 F.3d at 664; *Pourghoraishi v. Flying J, Inc.*, 449 F.3d 751, 754 (7th Cir. 2006).

Plaintiffs have had ample opportunity to come forward with evidence that would allow calculation of lost rental value for their properties.  They have blown those opportunities, and they will not be allowed to offer evidence of lost rental value.  General Motors argues that lost rental value is the sole measure of damages relevant for loss of enjoyment of property, so that without such evidence, plaintiffs cannot prove these damages.

The court reads Indiana law as providing greater flexibility in assessing damages for nuisance or trespass.  In *Town of Rome City v. King*, 450 N.E.2d 72, 79 (Ind. App. 1983), the plaintiffs proved that the town's operation of a sewage pumping station close to their property amounted to a nuisance, particularly since it spilled raw sewage on their property from time to time.  The plaintiffs recovered $6,000 in damages for those spills, and the Court of Appeals affirmed that award over a challenge that it was not sufficiently supported with evidence:

> As to the $6,000 damage award for the spillage of raw sewage on three occasions, the evidence is sufficient.  The Kings spent several hundred dollars on weed killer to counteract the fertilizing tendencies of the sewage and approximately $75 for road gravel to cover the dirt road which served as the path for the sewage.  The Kings also expended their time and energy to clean up the mess as Rome City never attempted to remove the debris.  Further, the Kings deserve compensation for the emotional and physical burden of dealing with the hazards created by the spillage and its inherent damage to the value of their property.  Viewed in this light the trial court's award is not excessive.

450 N.E.2d at 79.  *Rome City v. King* thus made clear that a damages award for the emotional and physical burden of dealing with such an injury to property could be compensated with a general (but reasonable) damages award.

Similarly, in *Rust v. Guinn*, 429 N.E.2d 299 (Ind. App. 1981), the court found that the defendants' operation of a lagoon for chicken manure amounted to a private nuisance harming the plaintiffs' property.  A jury awarded damages of $9,500.  The Court of Appeals affirmed that award over a similar challenge that it was not sufficiently supported with evidence of lost rental value:

> We think that dicta found in an early Indiana case is supportive of our conclusion.  In *Weston Paper Company v. Pope*, (1900) 155 Ind. 394, 57 N.E. 719, the plaintiffs were landowners who maintained a farm three miles downstream from the defendant corporation's paper mill.  Discharge of effluents from the mill into the stream produced a condition found to "constitute a nuisance," and an award of damages to the plaintiffs was sustained.  The court stated:
>
>> "We cannot agree that there was no legal evidence to sustain the assessment of damages.  There was direct evidence that a much larger amount of damages than that assessed by the court was sustained from impairment of rental value.  Besides, the court was not restricted to mere depreciation of property but might also have properly considered the inconvenience and discomfort caused (plaintiffs) and their families even though there be no arithmetical rule for the estimate of such damages.  Baltimore, etc., Co. v. Fifth Baptist Church, 108 U.S. 317, 335." (Our emphasis.)

115 Ind. at 402-03, 57 N.E. 719.

*Rust v. Guinn*, 429 N.E.2d at 303.   In the cited case of *Baltimore & Potomac Railroad*, the Supreme Court of the United States had affirmed a damages award on behalf of a church congregation, explaining:

> as the court below very properly said to the jury, the congregation had the same right to the comfortable enjoyment of its house for church purposes that a private gentleman has to the comfortable enjoyment of his own house, and it is the discomfort and annoyance in its use for those purposes which is the primary consideration in allowing damages.  As with a blow on the face, there may be no arithmetical rule for the estimate of damages.  There is, however, an injury, the extent of which the jury may measure.

*Baltimore & Potomac. Railroad Co. v. Fifth Baptist Church*, 108 U.S. 317, 335 (1883).

This means that plaintiffs will be able to describe their experiences, as they have described them in timely and proper disclosures and in their deposition testimony.  Plaintiffs may seek general damages for their annoyance and the disruption they have suffered in their enjoyment of their properties as a result of General Motors' alleged wrongful actions.  The plaintiffs will also be able to offer their own opinions, previously disclosed, as to the fair market values of their properties absent the pollution allegedly caused by General Motors and absent the disruption of the clean-up effort.

Accordingly, the court denies General Motors' motion for summary judgment on plaintiffs' claims for loss of use and enjoyment of their properties, but will limit plaintiffs' evidence and theories at trial as indicated.

IV.   *Emotional Distress Damages (Dkt. No. 517) and GM's Motion to Exclude Dr. Teitelbaum's Testimony (Dkt. No. 519)*

Almost all plaintiffs also seek $1.5 million each for emotional distress.  One seeks $3.5 million for emotional distress.  These numbers were first revealed in the February 12th disclosures and could not be offered at trial in any event.   In addition, General Motors has moved for summary judgment on this element of damage.  To an unusual degree, the parties' briefs on this issue seem to pass one another by.  Each side focuses on its own strongest points, and the problem is especially slippery because there is no sharp line between damages for annoyance, discomfort, and disruption in the enjoyment of property, on one hand, and damages for emotional distress on the other.  It probably makes most sense to approach the issue here as if it were a motion *in limine* seeking to limit certain types of evidence and argument to the jury about damages.  General Motors has also moved to exclude the testimony plaintiffs offer from Dr. Teitelbaum in support of their emotional distress damage claims.

For purposes of these motions, the court assumes that plaintiffs will be able to prove the merits of their claims for trespass and nuisance and will be able to prove that General Motors acted over the decades with knowledge that it was releasing PCBs that would reach these plaintiffs' properties.  The court also assumes for purposes of these motions that the ongoing clean-up effort has been very annoying and disruptive for the plaintiffs.

If they can prove their claims on the merits, plaintiffs will be entitled to recover damages consistent with Section 929 of the Restatement (Second) of Torts:

> (1) If one is entitled to a judgment for harm to land resulting from a past invasion and not amounting to a total destruction of value, the damages include compensation for
>
> (a) the difference between the value of the land before the harm and the value after the harm, or at his election in an appropriate case, the cost of restoration that has been or may be reasonably incurred,
>
> (b) the loss of use of the land, and
>
> (c) discomfort and annoyance to him as an occupant.

See generally *Allgood v. General Motors Corp.*, 2006 WL 2669337, at *22 (S.D. Ind. Sept. 18, 2006). The court continues to predict that Indiana courts would apply a flexible and reasonably generous standard for such discomfort and annoyance and loss of use, and the court keeps in mind Indiana's policy against windfall damages. At trial, as discussed above, the plaintiffs will be able to present evidence and argument about the restrictions on their ability to use and enjoy the land and on the discomfort and annoyance they have experienced.

The court also assumes that plaintiffs will be entitled to recover reasonable amounts for their discomfort, annoyance, and loss of use caused by the pollution and the clean-up effort, though without specific evidence about loss of rental value, for reasons discussed above. Though there is ample room for disagreement about the dollar value for such damages, it is difficult to see how those elements of damages could reasonably exceed the total value of plaintiffs' unpolluted

properties.   After all, Section 929 of the Restatement applies to "harm to land

resulting from a past invasion and *not amounting to a total destruction of value*."

A.    *Fear of Health Effects*

The real contested issue with respect to emotional distress is whether plaintiffs may also argue to the jury that they should recover damages for emotional distress resulting from the fear that they might become ill as a result of exposure to PCBs.  The court assumes that such damages might be available under Indiana law in an appropriate case, one in which a plaintiff could show that she faces increased health risks.  These plaintiffs, however, have offered no such evidence.

The undisputed facts here show that no plaintiff claims any present physical injury or present health effects from the exposure to PCBs.  There is no evidence that any plaintiff has PCBs in his or her blood at higher than background levels. Plaintiffs have offered no evidence that they have a higher risk of disease because of the exposure to PCBs.  Dr. Teitelbaum reached no such conclusion and made no individualized assessment of health risks.

Indiana adheres to a modified form of the "impact rule" when dealing with claims for emotional distress damages.  *Atlantic Coast Airlines v. Cook*, 857 N.E.2d 989, 995-97 (Ind. 2006) (reviewing development of Indiana law and affirming summary judgment on claim for negligent infliction of emotional distress where plaintiffs suffered no physical impact); *Alexander v. Scheid*, 726 N.E.2d 272, 283-84 (Ind. 2000) (reversing summary judgment for defendant where plaintiff showed

that defendant's negligence caused continued growth of cancerous tumor, reducing life expectancy and prospects of cure, and causing emotional distress). In the absence of evidence of physical impact on the plaintiffs themselves, this principle forecloses plaintiffs from recovering emotional distress damages on their negligence claims against General Motors.

Some of the parties' legal debate is at a relatively high level of abstraction, asking whether emotional distress damages might ever be available in a case of trespass and/or nuisance. The court is persuaded that the answer is yes, at least when the issue is phrased so broadly. In 1991 the Indiana Supreme Court held that emotional distress damages could be available regardless of physical impact on the plaintiff in cases of intentional torts, at least where the emotional effects of the tort were intended and reasonably foreseeable. *Cullison v. Medley*, 570 N.E.2d 27, 30 (Ind. 1991); see also *Atlantic Coast Airlines*, 857 N.E.2d at 997 n.7 (acknowledging *Cullison* holding on intentional torts). *Cullison* itself involved a claim for trespass, and the trespass and nuisance alleged by plaintiffs here are both intentional torts. The *Cullison* principle appears to cases involving knowing and intentional pollution of surrounding properties. Accord, *e.g.*, *Nnadili v. Chevron U.S.A., Inc.*, 435 F. Supp. 2d 93, 100-01 (D.D.C. 2006) (denying summary judgment for defendant on claims for emotional distress from intentional torts arising from discharge of gasoline from underground storage tanks).

But the general *Cullison* principle does not necessarily open the door to emotional distress damages in every case of intentional tort, regardless of the evidence.  In *Cullison* itself, the plaintiff had a friendly conversation with a 16 year old girl and invited her to have a Coke with him later and to come to his home to talk further.  After dark that night, the girl, her father, brother, mother, and brother-in-law knocked on the door of the plaintiffs home and then entered uninvited.  The trespassers called him a "pervert," said he was "sick," and told him to leave the girl alone.  The girl's father had a revolver in a holster strapped to his thigh and gestured in ways that the plaintiff understood as threats to shoot him.  570 N.E.2d at 28-29.  The girl's father approached the plaintiff two months later in a local restaurant, displaying a pistol and holster in front of the plaintiff's face.  The plaintiff testified that he suffered stress and sought psychological counseling as a result of these incidents.  The Indiana Supreme Court held that the absence of physical impact on the plaintiff did not bar his claims for emotional distress damages based on the trespass and intentional infliction of emotional distress:

> When one intentionally invades the premises of another in such a way as to provoke a reasonably foreseeable emotional disturbance or trauma of the rightful occupier of the premises, the occupier may, in addition to recovering damages to the realty, if any, recover damages for such emotional injury. The mere fact of a physical injury, however minor, does not make mental distress damages any less speculative, subject to exaggeration, or likely to lead to fictitious claims.  In fact, the experience in this state is that juries are equally qualified to judge someone's emotional injury as they are to judge someone's pain and suffering or future pain and suffering, and the presence or absence of some physical injury does nothing to alleviate the jury's burden in deciding whether the elements of mental suffering are present. We note there are those who argue that allowing recovery for mental damages will result in an inundation of the court system with such claims,

> but we do not believe that the workload occasioned by some possible increase in legitimate claims is any reason to deny or prohibit such claims.
>
> In the present case, the complaint alleges trespass and the testimony of Cullison supports such allegations.  It will be for the jury to determine whether the trespass occurred and whether such intentional trespass foreseeably would provoke an emotional disturbance or trauma.  Summary judgment was entered inappropriately on count one of Cullison's complaint.

570 N.E.2d at 30.  Few could doubt that emotional distress in response to the trespass in *Cullison* was both foreseeable and even intended (keeping in mind that the case was decided on summary judgment, with facts construed in favor of Cullison).   There was no suggestion in *Cullison* that the facts required the interpretation of expert witnesses to evaluate the severity or purpose of the invasion of Cullison's home. Cf. *Alexander v. Scheid*, 726 N.E.2d at 274-75 (plaintiffs offered expert testimony on effects of negligent failure to diagnose cancer earlier).   The Indiana Supreme Court therefore left to the jury in *Cullison* the question whether the intentional trespass foreseeably would provoke an emotional disturbance or trauma.


There is no suggestion here that General Motors acted with the intent to inflict emotional distress on these plaintiffs.   Most important, the disputed emotional effects here – the claims of fear for plaintiffs' health – necessarily involve matters beyond the scope of a lay jury's common knowledge and experience.  The problem for these plaintiffs is that they do not have evidence showing that any of them face an increased health risk as a result of anything General Motors might have done.  The plaintiffs have not directed the court's attention to any authority,

in Indiana or elsewhere, holding that an unsubstantiated fear of health risks can support an emotional distress claim, let alone claims of the magnitude plaintiffs assert here.   The general *Cullison* principle does not extend to this situation in which plaintiffs claim emotional distress based on fears of illness but have not offered any evidence of increased health risk.[5]

In an effort to reverse the burden of proof, plaintiffs argue that General Motors cannot prove that they do *not* face any health risks.  Plaintiffs contend that they have understandable fears about their health in the face of the General Motors' PCB releases and the clean-up effort.  Plaintiffs' fears were caused by General Motors' intentional conduct causing pollution of their land.   Unless General Motors can prove definitively that there is no increased risk, plaintiffs contend, their fears are reasonable and should be compensable.

The court assumes that plaintiffs' concerns about their health are reasonable, at least to the extent that some modest expense in testing blood levels and seeking expert advice on the extent of any risk might have been a reasonable

---

[5]I*n Indiana Michigan Power Co. v. Runge*, 717 N.E.2d 216 (Ind. App. 1999), the Indiana Court of Appeals addressed a similar situation.  Plaintiffs in *Runge* claimed that they had been injured by the defendant's operation of a high-voltage electrical line above their property.  The Court of Appeals affirmed summary judgment for the power company on the plaintiffs' claims of adverse health effects, and expert testimony on that issue clearly was essential for plaintiffs. *Id.* at 234-38.  The Court of Appeals was skeptical about the admissibility of expert testimony about whether plaintiffs' fears of health effects were reasonable, especially where the experts could not say that the electrical line had increased health risks for the plaintiffs, but the court did not definitively resolve the issue because the defendant had not raised the right argument on appeal. *Id.* at 238.

element of damages in a case like this.  But that is not what plaintiffs seek in their statements of damages.  Instead, each seeks more than one million dollars in damages for fears that, on this record, the court must treat as unsubstantiated.  The court has no reason to predict that Indiana courts would permit emotional damages for unsubstantiated fears.

For example, plaintiffs report that April, Angela and Lucinda Wessel have suffered from a number of illnesses and stress in their lives.  These women fear that some of those illnesses may have been caused by exposure to PCBs from the General Motors plant and that they may develop more illnesses.  If there were reliable evidence that any of the illnesses resulted from General Motors' pollution, both the physical and emotional effects could properly be considered in deciding damages.  But plaintiffs have had ample opportunity to find evidence of such effects.  They have not been able to do so.  They may not turn that very uncertainty – their inability to prove what could have been an essential element of their case – into evidence of compensable damages.[6]

_____

[6]Similarly, plaintiffs have suggested that PCB levels in body fat may provide a better marker of PCB exposure than blood levels do.  Pl. Br. 23 (Dkt. No. 528).  The burden of proof is on plaintiffs.  They have had ample opportunity to develop
(continued...)

B.    *Bystander Claims*

Some plaintiffs seek emotional distress damages based on their fears that their children or grandchildren or other family members may become ill or face increased health risks because of exposure to PCBs at the plaintiffs' property. General Motors has moved for summary judgment on these claims based on a lack of evidence of any such harm to any children, grandchildren, or others.  Plaintiffs have objected to General Motors' statements of undisputed fact on this point because they are not supported by citations to evidence.  Plaintiffs misunderstand the burden of proof here.  General Motors could properly seek summary judgment based on a lack of evidence on a necessary element of plaintiffs' claims.  That is the central teaching of *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Plaintiffs have not come forward with any evidence that any of their children, grandchildren, or other close relatives have suffered any physical harm from exposure to PCBs, or even that they are at higher risk of physical harm because of that exposure.  In the absence of such evidence, these adult plaintiffs are not entitled to recover for emotional distress based on their fears for these relatives.[7]

---

[6](...continued)
and offer such evidence if they wished to do so.  They have not.  Their failure to do so cannot be used to bolster their claims for emotional distress damages.

[7]This reasoning applies to Mr. and Mrs. Beedie, who have suggested that their son and daughter might have died as a result of exposure to PCBs.  Plaintiffs have not offered any evidence of such a tragic effect.  The unsubstantiated suggestion cannot support a claim for damages for fear that it might be true.

To sum up, General Motors' motion for summary judgment on plaintiffs' emotional distress damages claims (Dkt. No. 517) is granted, with the understanding that the principal focus of the motion is any effort by plaintiffs to offer evidence of or argue for emotional distress based upon fears about their own health or the health of relatives. This ruling does not, however, limit plaintiffs' ability to offer evidence of discomfort or annoyance resulting from the pollution and clean-up efforts, including emotional and aesthetic dimensions of loss of enjoyment.

C.    *Dr. Teitelbaum's Testimony*

In late 2006, when the court was giving plaintiffs an opportunity to regroup and rebuild their damages theories, plaintiffs indicated they intended to rely on the testimony of Dr. Teitelbaum to support their claims for emotional distress damages. Over General Motors' objection, the court gave plaintiffs the opportunity to provide a supplemental report from Dr. Teitelbaum on the subject. Plaintiffs elected not to do so. Plaintiffs argue that they will offer Dr. Teitelbaum's testimony not to support those claims directly but to provide background on PCBs and the health risks they can cause.

Plaintiffs have made it abundantly clear that they will not attempt to show that contamination of their properties has caused any measurable increased risk to their personal health. Pl. Br. 4. Nevertheless, the jury might reasonably wonder

why, if there is no health issue here, General Motors is spending millions of dollars on a clean-up effort under the supervision of the EPA and IDEM. It would be reasonable to allow a person knowledgeable in the field, like Dr. Teitelbaum, to provide background information to the jury about PCBs and the reasons why they provoke such concern. At the same time, it will be important to explain to the jury: (a) that these plaintiffs have all been tested for PCB exposure; (b) that there is no evidence that any of these plaintiffs have PCB levels in their blood above background levels; and (c) that there is no evidence that any of these plaintiffs are at increased health risks because of General Motors' Bedford operation.

General Motors opposes even this limited use of Dr. Teitelbaum for background purposes, which were not previously disclosed. See Dkt. No. 528, Tab V (red-lined version of Dr. Teitelbaum's report showing deletions based on earlier court decisions). But plaintiffs do not seem to plan to offer testimony from Dr. Teitelbaum that they have not previously disclosed. The court does not believe the plaintiffs' use of that testimony must be tied to the specific uses and purposes plaintiffs have identified before, as long as his testimony would in fact be relevant and useful to the jury. Accordingly, General Motors' motion to exclude testimony from Dr. Teitelbaum (Dkt. No. 519) is hereby denied. At trial the court will address in more detail the precise scope of the permissible testimony.

V.      *Well Water Remediation Damages*

General Motors has also moved for summary judgment on three plaintiffs' remaining claims for damages to three wells on their properties.  At an earlier stage of the case, the court concluded that plaintiffs' expert witness Dr. Dovantzis had offered admissible evidence about the cost of treating and monitoring those wells. *Allgood*, 2006 WL 2669337, at *16.  Based on other portions of that same decision, General Motors argues that the requested damages are (a) unreasonable as a matter of Indiana law and (b) speculative.  The following facts are undisputed or set forth the relevant evidence in the light reasonably most favor to plaintiffs as the non-moving parties.

A.      *Tracy Barlow*

Plaintiff Tracy Barlow owns and resides at Parcel 207, 704 Barlow Lane in Bedford.  She purchased the property in 2000 for $55,000, and in 2006, she estimated the property would be worth $90,000 in the absence of PCBs.  Ms. Barlow is approximately 40 years old.

All water that Ms. Barlow has used for drinking or any other purposes comes from a public water utility, not from groundwater, and has met all applicable federal and state standards for drinking water.

Parcel 207 contains an inoperable and abandoned well. The well was buried and rendered inoperable before Ms. Barlow bought the property, though she had also lived there as a child and recalled that there was a well. Barlow Dep. 242-45.

Before this lawsuit was filed, Ms. Barlow allowed GM to sample the abandoned well on June 4, 2002. The two samples tested positive for Aroclor 1242 in concentrations of 3.8 ppb and 0.87 ppb. The tests were negative for other Aroclors. GM provided the test results to Barlow, the EPA, and IDEM.[8]

Barlow is not under any legal requirement or order to use well water from Parcel 207 or to monitor, test, or treat well water. Since 2002, she has not monitored or treated the well water from Parcel 207. Barlow seeks damages of $417,939 as the present value of the cost to monitor and treat her well water for 20 years.

B.    *Robert and Rose Fidler*

Plaintiffs Robert and Rose Fidler own and reside at Parcel 208, 620 Barlow Lane in Bedford. Mr. Fidler purchased Parcel 208 in 1976 and married Rose Fidler the following year. They are both approximately 80 years old. In 2006, the Fidlers estimated the fair market value of their property without PCBs would be $200,000.

---

[8]Aroclors are different specific types of PCB molecules.

Since 1976, the public water utility has supplied Parcel 208 with water, including drinking water, which meets all applicable federal and state standards for drinking water.

Parcel 208 contains one operable water well. The Fidlers had used the well for exterior watering and washing, including growing produce for sale, until 2001, when General Motors advised them not to use the well water because it was not safe. At General Motors' expense, the well was rendered inoperable. General Motors and the Fidlers have agreed that the Fidlers will waive and will not pursue any claims against General Motors based on their decision to stop selling produce grown on or from their property. See Dkt. No. 506, Ex. B (stipulation to resolve discovery dispute in which General Motors sought tax records).

Before this lawsuit was filed, the Fidlers allowed General Motors to sample the well on July 24, 2001 and September 15, 2001. The results for Aroclor 1242 were 1.1 ppb and 0.95 ppb. General Motors reported the results to the Fidlers, the EPA, and IDEM.

The Fidlers are not under any legal requirement or order to use well water from parcel 208 or to monitor, test, or treat well water. Since 2002, the Fidlers have not monitored or treated the well water from Parcel 208. They seek damages of $417,939 as the present value of the cost to monitor and treat well water for 20 years.

C.    *James and Heidi Dalton*

Plaintiffs James and Heidi Dalton own and reside at Parcel 388, 421 Lawrence Street in Bedford.  James Dalton received the parcel from an aunt in 2001.  Jim Dalton grew up on the property he now owns and is emotionally attached to it because of that history.  In 2006, the Daltons estimated the fair market value of their property without PCBs would be $110,000.

Since before 2001, all water that the Daltons have used, including drinking water, has come from the public water utility, which meets all applicable federal and state standards for drinking water.

Parcel 388 contains one abandoned well that has been shut off and inoperable since before the Daltons took ownership.  The Daltons have never used the well.

Before this lawsuit was filed, the Daltons allowed General Motors to sample water from the abandoned well.  The results for Aroclor 1242 were 0.13 ppb and 0.26 ppb.  General Motors reported the results to the Daltons, the EPA, and IDEM.

The Daltons are not under any legal requirement or order to use well water from Parcel 388 or to monitor, test, or treat well water.  Since 2002, the Daltons have not monitored or treated any well water from Parcel 388.  They seek damages

of $77,363 as the present value of a plan to monitor (not treat) their well water for 20 years.

      D.    *General Motors*

For purposes of summary judgment on the well water issue, the court assumes that General Motors released PCBs that have contaminated plaintiffs' land and that it acted deliberately, knowing that it would, or would likely, pollute the surrounding land and groundwater.

In 2001, General Motors and the EPA entered into a Performance Based Corrective Action Agreement under which GM agreed to investigate, stabilize, and remediate releases of PCBs from the Bedford plant. As part of that effort, General Motors tested water from 25 wells within a one-half mile radius of the Bedford plant. Six of the wells tested positive for PCBs. General Motors and the EPA have not yet agreed upon a final workplan, known as "Final Corrective Measures," which would be subject to public comment.

E.     *Plaintiffs' Proposed Monitoring and Testing Plan*

Plaintiffs have based their damages claims for these plaintiffs' wells on a plan devised by Dr. Kostas Dovantzis.  Dr. Dovantzis proposes no water treatment for the Daltons' property (Parcel 388), where the test results were below 0.5 ppb.  For Parcels 207 (Barlow) and 208 (Fidler), he proposes a granular activated carbon treatment system for each parcel at a cost of $1,750.  He also proposes sampling and analysis at an annual cost per parcel of $4,800 for sampling, $18,000 for analysis, and $2,040 for data reporting.  Carrying out this program for 20 years would cost a present value of $417,939 for each of the two parcels.  For Parcel 388 (Dalton), Dr. Dovantzis estimates annual monitoring costs of $5,200 for 20 years, with a present value of $77,363.  Dr. Dovantzis' plan would not actually clean up or remediate any contamination of groundwater on any of the parcels.

F.     *Legal Issues*

General Motors seeks summary judgment holding that Barlow, the Fidlers, and the Daltons are not entitled to the cost of the proposed well water monitoring and treatment plan.  General Motors argues that the proposed damages are unreasonably excessive in light of the fair market value of the plaintiffs' properties and the fact that there would be no requirement that damages paid would actually be used to remediate the pollution.  General Motors also argues that the proposed damages are speculative because General Motors and the EPA have not yet determined what the final corrective measures will be.  Plaintiffs argue that

General Motors' deliberate pollution of their property has deprived them of an important right of property ownership, the right to use groundwater from the property.  Plaintiffs argue that the appropriate measure of damages is the cost to restore the property to its original condition, regardless of how that cost might compare to the fair market value of the property.

G.   *Reasonableness*

In the September 2006 entry on some closely related issues, the court did not express a view either way as to the damages theory for the well water claims. The court's reasoning on the plaintiffs' earlier demand for $78 million in remediation costs for properties with a total fair market value of approximately $4 million applies to the well water monitoring and treatment claims.  For the reasons set forth in *Allgood v. General Motors Corp.*, 2006 WL 2669337 (S.D. Ind. Sept. 18, 2006), the court concludes that damages based on the proposed monitoring and treatment plans are unreasonable as a matter of law under Indiana law.

Plaintiffs Barlow and Mr. and Mrs. Fidler point out correctly that General Motors' pollution of their property has effectively deprived them of one right of an owner:   the right to use groundwater from the property.   The Daltons are understandably reluctant to use the well without testing.  But all three of these parcels are served by a public water utility.  The demands that the loss of that one stick from the property owner's bundle of rights should be compensated by

-41-

payment of more than four times, more than two times, and more than half of the entire fair market values of the three properties are unreasonable under Indiana law. The Daltons seek the lowest amount, about half the fair market value of their property. They seek this only for testing a well that they have never used. That would not be a reasonable conclusion under Indiana law.

Under other circumstances, the court's reasoning would not necessarily bar plaintiffs from offering evidence showing that the contamination of the wells has diminished the value of their properties. One might reasonably ask how much the loss of use of a well would diminish the value of property that is served by a safe and reliable public water utility, but at least in theory, some compensation would be available. When given a final opportunity to rescue their damage theories, however, plaintiffs offered no evidence or explanation addressing the loss of use of these wells as an element of their damages.

Similarly, if the loss of use of the wells interfered noticeably with these plaintiffs' use and enjoyment of their properties, that loss could be compensable as part of overall damages for loss of use and enjoyment. These plaintiffs have offered no such evidence. Accordingly, the court grants General Motors' motion for summary judgment on the claims for damages based on contamination of the three wells in question.

*Conclusion*

Accordingly, the court (a) grants defendant General Motors' motion to bar plaintiffs' belated damages disclosures and for sanctions (Dkt. No. 510); (b) denies General Motors' motion for summary judgment on loss of enjoyment damages (Dkt. No. 512), although plaintiffs will not be able to rely on the evidence and theories they first disclosed in the late disclosures; (c) grants General Motors' motion for summary judgment on plaintiffs' claims for emotional distress damages to the extent those claims are based on fear of health effects (Dkt. No. 517), although plaintiffs will be able to present evidence on annoyance, harassment, and disturbance of their ability to enjoy their property; (d) denies General Motors' motion to exclude the testimony of Dr. David Teitelbaum (Dkt No. 519); and (e) grants General Motors' motion for summary judgment on the claims of several plaintiffs for damages based on contamination of three water wells (Dkt. No. 492). General Motors may submit no later than February 20, 2009 a statement of its fees and costs incurred in preparing and briefing its motion to exclude the February 12th disclosures.   Plaintiffs may file a response no later than 14 days later. Finally, the court denies as moot and superseded General Motors' earlier motion to dismiss and to preclude plaintiffs' claims for damages (Dkt. No. 494).  The court will set a new trial date after conferring with counsel.

So ordered.

Date: January 20, 2009

_David F Hamilton_
_____
DAVID F. HAMILTON, CHIEF JUDGE
United States District Court
Southern District of Indiana

Copies to:

William  Bock III
KROGER GARDIS & REGAS
wb@kgrlaw.com

Reynolds B. Brissenden
KROGER GARDIS & REGAS
tjb@kgrlaw.com

Gregory P. Cafouros
KROGER GARDIS & REGAS, LLP
gpc@kgrlaw.com

Martin Czinczel Calhoun
SPRIGGS & HOLLINGSWORTH
mcalhoun@spriggs.com

Andrew Rudolph Falk
KROGER GARDIS & REGAS LLP
arf@kgrlaw.com

Bruce A. Featherstone
FEATHERSTONE PETRIE DESISTO
bfeatherstone@featherstonelaw.com

Robert William Finnerty
GIRARDI & KEESE
rfinnerty@girardikeese.com

Thomas Vincent Girardi
GIRARDI & KEESE
tgirardi@girardikeese.com

Jay P. Kennedy
KROGER GARDIS & REGAS LLP
jpk@kgrlaw.com

James A. Knauer
KROGER GARDIS & REGAS, LLP
jak@kgrlaw.com

Walter J. Lack
ENGSTROM LIPSCOMB & LACK
wlack@elllaw.com

Katharine R. Latimer
SPRIGGS & HOLLINGSWORTH
klatimer@spriggs.com

Brian J. Leinbach
ENGSTROM LIPSCOMB & LACK
bleinbach@elllaw.com

Frank  Leone
SPRIGGS & HOLLINGSWORTH
fleone@spriggs.com

Kurtis Allen Marshall
KROGER, GARDIS & REGAS LLP
kam@kgrlaw.com

John F. McCauley
BINGHAM MCHALE LLP
jmccauley@binghammchale.com

Lee B. McTurnan
BINGHAM MCHALE LLP
lmcturnan@binghammchale.com

Ignacia S. Moreno
SPRIGGS & HOLLINGSWORTH
ppalugod@spriggs.com

W. Ray Persons
KING & SPALDING LLP
rpersons@kslaw.com

Frank C. Porada

FEATHERSTONE PETRIE DESISTO
fporada@featherstonelaw.com

Traci Meakem Richmond
SPRIGGS & HOLLINGSWORTH
fleone@spriggs.com

Carrie J. Rognlien
GIRARDI & KEESE
crognlien@girardikeese.com

Sydney L. Steele
KROGER GARDIS & REGAS LLP
sls@kgrlaw.com

David E. Wright
KROGER GARDIS & REGAS LLP
dew@kgrlaw.com